[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 550.]

INTERNATIONAL SALT COMPANY, N.K.A. AKZO SALT, INC., APPELLANT, *v*.
TRACY, TAX COMMR., APPELLEE.

[Cite as *Internatl. Salt Co. v. Tracy*, 1996-Ohio-106.]

*Taxation—Use tax—Exemptions—Waste conveyor system and Wagner trucks
used by salt mining company not exempt under R.C. 5739.01(E)(2) as used
directly in mining or refining.*

(No. 94-2572—Submitted September 28, 1995—Decided February 21, 1996.)

APPEAL from the Board of Tax Appeals, No. 92-S-504.

————————————

{¶ 1} International Salt Company, n.k.a. Akzo Salt, Inc. ("International Salt"), appellant, has been granted a lease by the state of Ohio to mine salt from an area under Lake Erie. The entrance to the mine is on Whiskey Island, an area about a mile and a half from downtown Cleveland, Ohio. The actual mining site is located about 1,765 feet below Lake Erie. The salt bed currently being mined has a total thickness of about forty-two feet; however, only the upper twenty feet are being removed.

{¶ 2} The mining system being used is the room and pillar system. Under this method, about fifty percent of the salt is removed, leaving a series of rooms which are about forty-five feet square, supported by pillars of salt which are one hundred and five feet square. Salt that is blasted from the face of the salt bed is taken first to a portable crusher/feeder to reduce it to a size under four inches. From the crusher/feeder, the salt is transported by conveyor belt to an underground mill, where it is crushed further and screened for size. At the end of the milling process, the salt is separated by size, with the proper-size salt particles being removed to the surface for sale. In addition to the salt that is being sold, the process also produces waste material consisting of rock reject and fines that are placed on a waste

conveyor to be taken back into the mine. The rock reject is a hard anhydrite material that is separated from the salt in the milling process; fines are salt material which has been crushed below a thirty-mesh size. A small amount of the fines is removed to the surface to be used in making salt blocks.

{¶ 3} The waste conveyor system moves the waste material over a mile from the mill area back into the central part of the mine. At the end of the conveyor, the waste is loaded into specially built four-wheel drive articulated trucks called Wagner trucks. The unique feature of the Wagner truck is that, instead of having a standard dump bed that raises to empty the load, the load is pushed out the back of the bed by a pusher plate.

{¶ 4} All the waste material is reused in the mine in one of several ways. Some of the fines are spread as a dressing to smooth the road surfaces in the mine. Other waste material is piled along the edge of the roadways to form berms six to eight feet high against the ribs of the walls. The berm serves to keep mine personnel away from the walls, and, by having the berm, the ribs do not have to be scaled routinely to remove loose material.

{¶ 5} Another use of the waste material is for pillar stabilization. Salt is a visoelastic material that will creep and move under a load. As a result, over time, vertical pressure on the pillars will cause the surface of the pillars to bulge and slab. To help stabilize the pillars, the waste material is piled against them.

{¶ 6} Waste material is also used to build brattices. A brattice covers the entrance to a room, to control the ventilation air within the mine. In building a brattice, waste material is piled across the entrance of a room to within a few feet of the ceiling, and a plastic curtain is hung between the ceiling and the top of the waste material to further seal the room. Finally, some of the waste material is used to bury trash, and some is also used to barricade parts of the mine. The only two items being contested in this appeal are the waste conveyor system and the Wagner trucks.

**{¶ 7}** The tax at issue is a use tax for the audit period January 1, 1983 through June 30, 1986. The order of the Tax Commissioner assessing the use tax on the waste conveyor and the Wagner trucks was affirmed by the Board of Tax Appeals ("BTA").

**{¶ 8}** This cause is now before this court upon an appeal as of right.

*Fred Siegel Co.*, *L.P.A.*, and *Annrita S. Johnson*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Thelma Thomas Price*, Assistant Attorney General, for appellee.

_____

***Per Curiam.***

**{¶ 9}** While the tax at issue is a use tax, R.C. 5741.02(C)(2) exempts from the use tax, acquisitions "which if made in Ohio would be a sale not subject to the tax imposed by sections 5739.01 to 5739.31 of the Revised Code." We will discuss only the applicability of the sales tax exemptions. International Salt contends the waste conveyor system and the Wagner trucks should be exempted under R.C. 5739.01(E)(2) as used directly in mining or, in the alternative, as used in refining.

**{¶ 10}** Former R.C. 5739.01(E)(2) provided in pertinent part:

"'Retail sale' and 'sales at retail' include all sales except those in which the purpose of the consumer is:

"***

"(2) To incorporate the thing transferred as a material or a part, into tangible personal property to be produced for sale by *** refining, or to use or consume the thing transferred directly in the production of tangible personal property, *** for sale by *** refining, or mining, including without limitation the extraction from the earth of all substances which are classed geologically as minerals ***." (141 Ohio Laws, Part II, 3281.)

**{¶ 11}** The first paragraph of the syllabus of *Dye Coal Co. v. Evatt* (1944), 144 Ohio St. 233, 29 O.O. 397, 58 N.E.2d 653, adopted the following definition of the word "mine":

"'[A]n underground or surface excavation or development, with or without shafts, *** for the extraction of coal, gypsum, asphalt, rock or other materials, *** and shall embrace any and all of the land or property of the mining plant, and the surface and underground, that is used or contributes directly *** to the mining properties, concentration or handling of coal *** or other materials containing the same.'" *Id.* at paragraph one of the syllabus. We went on to further state that the term "mining" "cannot properly be restricted to mere severance of the raw material from the earth, but includes such movement and handling thereof on the surface as in this instance is essential for the production of coal." *Id.* at 236, 29 O.O. at 398, 58 N.E.2d at 655. In *Dye*, we held that trucks used to haul coal from the pits to the tipple, where the coal was cleaned and graded, were used directly in mining.

**{¶ 12}** The question in this case is whether the equipment in question is used "directly" in mining. In *Fyr-Fyter Co. v. Glander* (1948), 150 Ohio St. 118, 37 O.O. 432, 80 N.E.2d 776, we pointed out that the predecessor of R.C. 5739.01(E)(2) did not contain the concept that the thing transferred must be used "directly in the production of tangible personal property for sale by *** refining, *** mining ***." In *Fyr-Fyter* we stated that we believed the legislative intent of inserting the word "directly" was to "narrow the field" from an exception "involving property used or consumed in certain industries, to one involving property used or consumed in a certain manner by those industries." *Id.* at 122, 37 O.O. at 433, 80 N.E.2d at 779.

**{¶ 13}** In *Powhatan Mining Co. v. Peck* (1953), 160 Ohio St. 389, 52 O.O. 246, 116 N.E.2d 426, the question was whether specifically designed trucks used to haul gob from a coal-cleaning plant were used directly in mining. We noted that if the question of direct use were allowed to depend upon the facts and

4

circumstances of each case, without reference to decisions rendered in other cases, this court would merely be contributing to the confusion caused by the ambiguous statutory word "directly." *Id*. at 394, 52 O.O. at 248, 116 N.E.2d at 428. In *Powhatan*, we relied upon the holding of *Tri-State Asphalt v. Glander* (1950), 152 Ohio St. 497, 504-505, 41 O.O. 40, 43, 90 N.E.2d 366, 369-370, for the concept that where the principal use of property is transportation to or from an activity, as distinguished from transportation which is part of that activity or between essential steps of that activity, such use is not directly in such activity. Based on that concept, we held that the trucks in *Powhatan* which removed the gob (or waste) from the processing plant were not used directly in mining or processing.

{¶ 14} In *Consolidation Coal Co. v. Bowers* (1963), 174 Ohio St. 228, 22 O.O.2d 222, 188 N.E.2d 419, we held that car retarders, which are pieces of equipment that are hooked to a coal car as it approaches a tipple for loading processed coal, were not exempted. The car retarders were not exempted because they were used after the coal was mined and processed. In a more recent decision, *Consolidation Coal Co. v. Kosydar* (1975), 42 Ohio St.2d 189, 71 O.O.2d 180, 326 N.E.2d 864, we held that equipment used for the maintenance and repair of haul roads was not exempted. We recognized that while road maintenance may be essential, the equipment did not come within the terms of TX-15-09 (now Ohio Adm. Code 5703-9-22). Ohio Adm. Code 5703-9-22(C) exempted the aggregate gravel and other materials which will be incorporated into certain haulways. However, Ohio Adm. Code 5703-9-22 did not exempt the machinery used to haul or spread the aggregate gravel.

{¶ 15} Based on these authorities, we determine the waste conveyor system and the Wagner trucks are not used directly in mining. The waste conveyor essentially serves the same purpose as that of the trucks in *Powhatan* by removing waste product after the processing of salable product has ended. Likewise, the

Wagner trucks are also like the trucks in *Powhatan*, in that the Wagner trucks are merely a continuation of a transportation system for removing waste.

{¶ 16} International Salt contends that if the waste were not removed, it would pile up and the mine would have to shut down. A similar argument was rejected by this court in *Crowell-Collier Publishing Co. v. Glander* (1951), 155 Ohio St. 511, 44 O.O. 460, 99 N.E.2d 649, wherein the taxpayer publishing company contended that a conveyor system which carried completed magazines to be loaded into transportation vehicles was part of a continuous manufacturing process. In *Powhatan* it was alleged that the cleaning plant would shut down in ten minutes if the gob were not removed. We denied the exemption, stating that "[t]he necessity of removing by-product in order to continue the production by *** mining *** was no greater than the necessity of removing the useful product in the *Crowell Publishing Co. case* in order to continue the production ***." *Id*. at 395, 52 O.O. at 248, 116 N.E.2d at 429.

{¶ 17} Appellant's second contention is that the equipment at issue was used in a refining process. During the audit period, the word "refining" was not defined in the sales tax statutes. Effective July 1, 1990, "refining" has been defined by R.C. 5739.01(Q) to mean "removing or separating a desirable product from raw or contaminated materials by distillation or physical, mechanical, or chemical processes." (143 Ohio Laws, Part IV, 5576.) Even this definition of "refining" does not include transportation of the waste products after the refining has ended.

{¶ 18} In support of its contention, International Salt relies upon a BTA decision, *Ashland Oil, Inc. v. Limbach* (June 29, 1990), BTA case No. 88-B-701. In *Ashland*, the BTA granted an exemption for an exhaust stack which was part of a fume incineration system. Fumes from an asphalt refining process were returned to be burned as process fuel. In the instant case, the refining of the salt ends before the rock reject and fines are placed on the waste conveyor or into the Wagner trucks. Before it can be argued that *Ashland* is a persuasive analogy, the waste conveyor

and the Wagner trucks would have to be used to return the waste materials to the refining process. Those are not the facts in this case. We find the *Ashland* case not applicable.

{¶ 19} Accordingly, we affirm as reasonable and lawful the BTA's decision denying exemption for the waste conveyor and the Wagner trucks.

*Decision affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

{¶ 20} Because I have a broader view of manufacturing than the majority does, I respectfully dissent.

_____